**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **JORGE M.,**<br><br>     **Plaintiff,**<br><br>     **v.**<br><br>**KILOLO KIJAKAZI, Acting Commissioner of Social Security,**<br><br>     **Defendant.** | Civ. No. 21-13794 (KM)<br><br>**OPINION** |

<u>**KEVIN MCNULTY, U.S.D.J.:**</u>

Plaintiff Jorge M. brings this action to review a final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Title II Disability Insurance Benefits ("DIB"). The Court is not without sympathy for the claimant, who has endured a number of impairments and multiple surgeries over the years. There is substantial evidence, however, to support the Commissioner's decision that those impairments do not rise to the level of preventing him from performing his sedentary work as a systems analyst. The decision is therefore **AFFIRMED**.

## I.   BACKGROUND[1]

Jorge M. applied for DIB pursuant to Sections 216(i) and 223(d) of the Social Security Act ("SSA") on September 13, 2018. He claimed a period of disability beginning on February 1, 2017, based on back, knee, hip, shoulder, and ankle impairments, as well as hypertension. (R. 16.) His application was

---

[1]    Citations to the record are abbreviated as follows:

    DE = docket entry

    R. _ = Administrative Record (DE 5)

    Pl. Br. = Jorge M.'s moving brief (DE 8)

    SSA Br. = the Administration's responding brief (DE 9)

    Pl. Reply = Jorge M.'s reply brief (DE 10)

denied initially and upon reconsideration. (R. 111–16, 122–24.) On July 16, 2020, he had a hearing before an Administrative Law Judge ("ALJ") to review his application de novo. (R. 33–56, 125.) ALJ Kenneth Ayers heard testimony from the plaintiff, who was represented by counsel, and from a vocational expert ("VE"). On October 8, 2020, Judge Ayers issued a decision finding that Jorge M. was not disabled through September 30, 2020, because he could perform his past sedentary work as a systems analyst. (R. 11–20) The Appeals Council denied Plaintiff's request for review on June 3, 2021, rendering the ALJ's decision a final decision of the Commissioner. (R. 1–7) This appeal followed.

## II.   DECISION FOR REVIEW

### A. The Five-Step Process and this Court's Standard of Review

To qualify for Title II DIB benefits, a claimant must meet the insured status requirements of 42 U.S.C. § 423. To qualify, a claimant must show that he is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted (or can be expected to last) for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(c), 1382(a).

Under the authority of the SSA, the Social Security Administration (the "Administration") has established a five-step evaluation process for determining whether a claimant is entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920. This Court's review necessarily incorporates a determination of whether the ALJ properly followed the five-step process, which is prescribed by regulation. The steps may be briefly summarized as follows:

**Step 1:** Determine whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 CFR §§ 404.1520(b), 416.920(b). If not, move to step two.

**Step 2:** Determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c),

416.920(c). If the claimant has a severe impairment, move to step three.

**Step 3:** Determine whether the severe impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 CFR Pt. 404, Subpt. P, App. 1, Pt. A. If so, the claimant is automatically eligible to receive disability benefits (and the analysis ends); if not, move to step four. *Id.* §§ 404.1520(d), 416.920(d).

**RFC and Step 4:** Determine the claimant's "residual functional capacity" ("RFC"), meaning "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). *Caraballo v. Comm'r of Soc. Sec.*, 2015 WL 457301, at *1 (D.N.J. Feb. 3, 2015). Decide whether, based on his RFC, the claimant can return to his prior occupation. 20 C.F.R. § 1520(a) (4)(iv); *Id.* §§ 404.1520(e)–(f), 416.920(e)–(f). If not, move to step five.

**Step 5:** At this point, the burden shifts to the Administration to demonstrate that the claimant, considering his age, education, work experience, and RFC, is capable of performing jobs that exist in significant numbers in the national economy. 20 CFR §§ 404.1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91–92 (3d Cir. 2007). If so, benefits will be denied; if not, they will be awarded.

On appeal, the Court conducts a plenary review of the legal issues. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). Factual findings are reviewed "only to determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence is "less than a preponderance of the evidence but more than a mere scintilla." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citation omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* When substantial evidence exists to support the ALJ's factual

findings, this Court must abide by the ALJ's determinations. *See id.* (citing 42 U.S.C. § 405(g)).

This Court may, under 42 U.S.C. § 405(g), affirm, modify, or reverse the Commissioner's decision, or it may remand the matter to the Commissioner for a rehearing. *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984); *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 865–66 (3d Cir. 2007). Outright reversal with an award of benefits is appropriate only when a fully developed administrative record contains substantial evidence that the claimant is disabled and entitled to benefits. *Podedworny,* 745 F.2d at 221–222; *Morales v. Apfel,* 225 F.3d 310, 320 (3d Cir. 2000).

Remand is proper if the record is incomplete, or if there is a lack of substantial evidence to support a definitive finding on one or more steps of the five-step inquiry. *See Podedworny*, 745 F.2d at 221–22. Remand is also proper if the ALJ's decision lacks adequate reasoning or support for its conclusions, or if it contains illogical or contradictory findings. *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119–20 (3d Cir. 2000); *Leech v. Barnhart*, 111 F. App'x 652, 658 (3d Cir. 2004) ("We will not accept the ALJ's conclusion that Leech was not disabled during the relevant period, where his decision contains significant contradictions and is therefore unreliable."). It is also proper to remand where the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted).

### B. The ALJ's Decision

ALJ Ayers undertook the necessary step-by-step inquiry.

### Step 1

The ALJ concluded that Jorge M. had not engaged in substantial gainful activity from February 1, 2017, the alleged onset date, through September 30, 2020, the date last insured. (R. 14.)

### Step 2

The ALJ found that through the date last insured, Jorge M. had the following severe impairments:

> obesity; degenerative joint disease, right hip, noted as end stage; status-post total right hip replacement; degenerative joint disease, left knee, noted as bone-on-bone apposition; status-post left knee total replacement; degenerative joint disease, right knee, status-post total right knee replacement; cervical stenosis with right arm symptoms; degenerative disc disease, lumbar spine; status-post interlamellar laminotomy L4-5 left with excision of herniated nucleus pulposus in 1977; right shoulder internal derangement, status-post arthroscopy (20 CFR 404.1520(c)).

(R. 14)

Appropriately citing to the medical evidence, the ALJ found that the following claimed conditions did not interfere with the claimant's ability to perform basic work activities, and hence were not severe: "degenerative joint disease of the left hip, hypertension, sleep apnea, acquired hyperlipoproteinemia, right eye vitreous degeneration, cataracts, chronic rhinitis, epistaxis, deviated nasal septum, gastroesophageal reflux disease ("GERD"), dystonia, and trigger finger, middle finger, left hand." (R. 14–15)

Noting a claimed history of fibromyalgia, the ALJ found that the evidence did not support a finding that it was a medically determinable impairment, citing the standards of Social Security Ruling ("SSR") 12-2p. (R. 15)

### Step 3

With respect to the impairments found to be severe, the ALJ determined that Jorge M. did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15.) In particular, the ALJ's discussion of the evidence focused on Listings 1.02 (major dysfunction of a joint), 1.03 (reconstructive surgery), and 1.04 (disorders of the spine). The ALJ added that he had considered the effect of obesity under SSR 19-2p. (R. 15–16.)

### RFC and Step 4

Next, ALJ Ayers defined the claimant's RFC:

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can sit for 6 hours, stand and/or walk for 4 hours combined. He can frequently reach overhead on the right. For all other reaching he can frequently reach with the right upper extremity. He can frequently handle and finger items with the left hand. The claimant can occasionally climb ramps and stairs, never climb ladders ropes or scaffolds, and occasionally balance, and stoop. He can never kneel, crouch, or crawl. The claimant can never work at unprotected heights, and never work around hazardous moving mechanical parts.

(R. 16.) The ALJ analyzed at length the evidence supporting that RFC determination. (R. 16–19.)

Based on the RFC, the ALJ concluded at Step 4 that

the claimant was capable of performing past relevant work as a systems analyst, Dictionary Of Occupational Titles ("DOT") 030.167-014, Specific Vocational Preparation ("SVP") 7, skilled, sedentary exertion. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

(R. 20) As required, the ALJ considered Jorge M.'s position both as he actually performed it and as it is generally performed.

As a result, the ALJ concluded that Jorge M. was not under a disability in the relevant period, without the necessity of proceeding to Step 5 to consider other work available in the national economy.

## III.    DISCUSSION

Jorge M.'s appeal focuses on four aspects of the ALJ's decision: (a) the ALJ's step two finding that fibromyalgia was not a medically determinable impairment; (b) the ALJ's failure to include further limitations based on Jorge M.'s subjective complaints of pain; (c) the ALJ's alleged failure to properly weigh the lay witness statements of Jorge M.'s daughter and sister; (d) additional evidence of a trigger finger condition.

6

### A. Step Two finding regarding fibromyalgia

As noted above, a severe impairment or combination of impairments must significantly limit a person's "physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Moreover, such a severe impairment "must have lasted or must be expected to last for a continuous period of at least twelve months." 20 C.F.R. § 404.1509. To qualify for such consideration, however, the impairment must be a medically determinable one.

The ALJ determined at step two that Jorge M.'s claimed history of fibromyalgia was not sufficient to support a finding that it was a "medically determinable" impairment that rose to the level of being "severe."[2] The ALJ noted, accurately, that the evidence of fibromyalgia in the record was essentially historical, consisting of scattered diagnostic references preceding the relevant period. He reasoned as follows:

> While the claimant alleged a history of fibromyalgia, the evidence does not support this a medically determinable impairment in accordance with Social Security Ruling ("SSR") 12-2p. According to SSR 12-2p, a person has fibromyalgia if they have a history of widespread pain, at least eleven positive tender points on examination, and evidence that other disorders that could cause similar pain were excluded. Fibromyalgia is also diagnosed when the claimant has a history of widespread pain, repeated manifestations of six or more fibromyalgia signs, and evidence that other disorders were excluded. In this case, fibromyalgia is

---

[2]    The claimant points out, correctly, that this is a step two issue, involving not the ALJ's ultimate conclusions but his elimination of fibromyalgia from consideration as a medically determinable impairment.

The SSA points out, also correctly, that the claimant shifted his ground after receiving the ALJ's decision, falling back on the difficult-to-verify diagnosis of fibromyalgia. The original disability claim was based on hypertension and certain orthopedic or musculoskeletal conditions. (R. 228) At the hearing, counsel stated the "theory of the case," *i.e.,* that the disability claim was based on, "most notably, a number of orthopedic problems, including his back and his knee, and other joints." (R. 38–39) The ALJ's decision focused accordingly on the voluminous medical record concerning those conditions. Now, on appeal, the substantive thrust of plaintiff's challenge relates to fibromyalgia, based primarily on matters that occurred prior to the relevant period. That said, if the ALJ's ruling regarding fibromyalgia failed the substantial-evidence test, remand might nevertheless be appropriate.

reported by history in the record, but there is no evidence of specific treatment or how it was diagnosed (Exhibit 10F/4; 14F/2; 31F/5). Accordingly, without further information to suggest otherwise, fibromyalgia is not considered a medically determinable impairment for purposes of this review.

(R. 15)

Unpacking that analysis, I conclude that the ALJ's conclusion, if not inescapable, was well supported. *First*, the ALJ was on solid ground in noting that the diagnoses (or references to diagnoses), dating from before the relevant period, did not reveal "how [fibromyalgia] was diagnosed" in any systematic, medical fashion, and there was no record of treatment. *Second*, both the II.A and the II.B criteria (*see infra*) include a requirement that other impairments which might cause the symptoms be excluded, and the medical record contained no such exclusion analysis. *Third,* the historical data did not establish that fibromyalgia, if that is what it was, extended into the relevant period, or that it persisted for the necessary period of twelve months.

### 1. Diagnosis

I start with the diagnosis. A diagnosis alone (and *a fortiori* a reference to a past diagnosis) is not sufficient to establish that an impairment "limits basic work activities or impairs [the claimant's] capacity to cope with the...demands of working." *Salles v. Comm'r of Soc. Sec.,* 229 F. App'x 140, 144 (3d Cir. 2007). SSR 12-2p reaffirms that "we cannot rely upon the physician's diagnosis alone" to establish a medically determinable impairment. Rather, SSR 12-2p requires that fibromyalgia be established with reference to "the evidence we describe in section II.A or section II.B," and even then, only where "the physician's diagnosis is not inconsistent with the other evidence in the person's case record." SSR 12-2p, 2012 WL 3104869, at *2.

Section II.A incorporates the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia, and Section II.B incorporates the 2010 ACR Preliminary Diagnostic Criteria. Generally speaking, the II.A criteria require (1) a history of widespread pain, (2) at least 11 positive

tender points on physical examination, and (3) evidence that other disorders that could cause the symptoms or signs were excluded. The II.B criteria require (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety, or irritable bowel syndrome; and (3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.[3]

---

[3]    In somewhat more detail, the II.A criteria are as follows:

A. *The 1990 ACR Criteria for the Classification of Fibromyalgia.* Based on these criteria, we may find that a person has an MDI of FM if he or she has all three of the following:

1. A history of widespread pain—that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present.

2. At least 11 positive tender points on physical examination (see diagram below). The positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist.

  a. The 18 tender point sites are located on each side of the body at the:

    Occiput (base of the skull);

    Low cervical spine (back and side of the neck);

    Trapezius muscle (shoulder);

    Supraspinatus muscle (near the shoulder blade);

    Second rib (top of the rib cage near the sternum or breast bone);

    Lateral epicondyle (outer aspect of the elbow);

    Gluteal (top of the buttock);

    Greater trochanter (below the hip); and

    Inner aspect of the knee. . . . .

3. Evidence that other disorders that could cause the symptoms or signs were excluded. Other physical and mental disorders may have symptoms or signs that are the same or similar to those resulting from FM.[7] Therefore, it is common in cases involving FM to find evidence of examinations and testing that rule out other disorders that could account for the person's symptoms and signs. Laboratory testing may include imaging and other laboratory tests (for example, complete

Jorge M. was diagnosed with fibromyalgia in 2010, long before the claimed period of disability, which begins as of February 1, 2017. (R. 1119, 1122, 1125) Records from 2015 show 18 tender points and widespread pain, which would be relevant to the II.A criteria. These records, however, date from two years before the relevant period. As for the II.B criteria, the reported symptoms, such as headaches, are not repeated, are tied to other causes, do not stretch over six months, and for the most part fall outside the relevant period. The plaintiff essentially asks that the court and the ALJ glean these pre-2017 symptoms from the record and diagnose him with fibromyalgia in the relevant period.

A second weakness in the record is the lack of any indication of treatment for fibromyalgia. Given the claimant's history of regular monitoring and care, it is inconceivable that a significant condition, if found, would have gone untreated.

The initial, threshold problem with the claim of fibromyalgia, then, is that, as the ALJ found, the medical record lacks supporting detail, particularly as it might apply to the relevant period, *see infra*.

---

blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor). . . . .

The II.B criteria are as follows:

B. *The 2010 ACR Preliminary Diagnostic Criteria.* Based on these criteria, we may find that a person has an MDI of FM if he or she has all three of the following criteria:

1. A history of widespread pain (see section II.A.1.);

2. Repeated manifestations of six or more FM symptoms, signs, [9] or co-occurring conditions, [10] especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, [11] depression, anxiety disorder, or irritable bowel syndrome; and

3. Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded (see section II.A.3.).

2. *Exclusion of other conditions as causes*

Setting aside the sketchiness of the diagnostic evidence, the record also fails to meet the II.A or II.B requirement of "evidence that other disorders that could cause the symptoms or signs were excluded."

That exclusion requirement arises from the reality that there is no definitive test for fibromyalgia, an elusive condition which may mimic the effects of, *e.g.,* arthritis, a condition from which Jorge M. suffers. *See* n.3 at ¶ 3, *supra* (quoting II.A); *Friedman v. Berryhill*, No. CV 18-9446 (FLW), 2019 WL 1418132, at *10 (D.N.J. Mar. 29, 2019) ("Like arthritis, ... [fibromyalgia] can cause significant pain and fatigue, and it can interfere with a person's ability to carry on daily activities"). Accordingly, the requirement that other diagnoses be excluded has been given substantive bite, and may require denial of a claim. *Id.* at *9–*10 (holding that "the record is devoid of any objective medical evidence to support that her symptoms are only caused by fibromyalgia. In the absence of such medical information, the ALJ did not err by classifying Plaintiff's fibromyalgia as a non-severe impairment."); *see also Watson v. Saul*, No. 3:17-CV-11734, 2021 WL 165098, at *11 (D.N.J. Jan. 19, 2021) (denying claim, observing *inter alia* that "Plaintiff has cited to no evidence that other disorders that could have caused her symptoms were excluded, as is required under SSR 12-2p."); *Browner v. Berryhill,* Civ. No. 16-6237, 2018 WL 3031516, at *9 (E.D. Pa. June 19, 2018) ("without confirmation to exclude other diagnoses, it was proper for the ALJ to conclude that Plaintiff's fibromyalgia did not medically equate with a medically determinable impairment because there was inconclusive evidence as to any potential alternative causes of Plaintiff's pain symptoms.")

It is sufficient to note that no such medical evidence of an exclusionary diagnosis appears of record. And of course the record is replete with other impairments for which the claimant received treatment, surgical and otherwise,

in the relevant period.[4] The claim, insofar as it was based on fibromyalgia, was properly denied for lack of medical evidence that other potential sources of the symptoms were excluded.[5]

### 3. Relevant period

The medical evidence running from the start of the relevant period, February 1, 2017, shows regular, indeed intensive, medical care, but virtually no mention of fibromyalgia. As noted, the medical evidence from the relevant period overwhelmingly concerns the claimant's other complaints, which were treated with some success. The reason for the treatments was not any complaint or diagnosis of fibromyalgia.

---

[4]    To name only those found to be serious: obesity; degenerative joint disease, right hip, noted as end stage; status-post total right hip replacement; degenerative joint disease, left knee, noted as bone-on-bone apposition; status-post left knee total replacement; degenerative joint disease, right knee, status-post total right knee replacement; cervical stenosis with right arm symptoms; degenerative disc disease, lumbar spine; status-post interlamellar laminotomy L4-5 left with excision of herniated nucleus pulposus in 1977; right shoulder internal derangement, status-post arthroscopy.

Even from the claimant's own testimony, the sense is clear that the musculoskeletal complaints are primary, with fibromyalgia being treated as at best a secondary or confounding factor, and one that responded to pain medicine:

[F]or the fibromyalgia issue [pain medication] tends to kind of help somewhat. But for the other pains that I have, you know [INAUDIBLE] neck, stuff like that, I try to stay away from the hard medications that would, you know, that makes my stomach – or cause issues to my stomach.

(R. 43–44)

[5]    Of course, the ALJ and the court cannot perform their own, non-expert medical analysis; they must rely on the medical record. Running through plaintiff's papers is an implication that evidence of exclusion of other diagnoses existed, but was merely undeveloped. Remand is appropriate, according to the claimant, because the "ALJ should have inferred that earlier existing records might show that other potential diagnoses were excluded," but he "did not attempt to obtain additional records" from providers who treated the claimant prior to the relevant period. (Pl. Brf. 16–17) That claim is purely speculative, and the true facts should be within the claimant's control. Moreover, the medical record is far from skimpy, consisting of some 2600 pages dating back to 1975. Nor did plaintiff's counsel ever suggest that the record was incomplete, or bring to the ALJ's attention the existence of additional records, whether five days in advance of the hearing, as required, or thereafter. *See* 20 C.F.R. § 404.935.

For example, Jorge M. underwent hip replacement surgery and physical therapy for osteoarthritis, culminating in satisfactory results by June 2017. (R. 398, 407–09, 430, 2596–97). At that time, he reported only "minor complaints," was able to exercise, and showed normal strength. (R. 753)

In August 2017, he reported low back pain, which was treated conservatively, and he reported 90% improvement by October 2017. (R. 513–18, 2598–99)  In November 2017, he underwent left knee replacement surgery. By February or March 2018, he had discontinued pain medication, reported regular exercise, including walking, and was told he could return to work. (R. 445–59) He had regular examinations in May, June, July, August, and September 2018, none of which reported either fibromyalgia or musculoskeletal complaints. (R. 676–91)

In September 2018, the claimant reported joint pain, but his exam was normal. (R. 473–75) In November 2018, he reported lower back pain following some heavy lifting, but after a month of physical therapy he reported 80% improvement. (R. 283, 507–10)

In the first half of 2019, records show no complaints or treatment for musculoskeletal problems or fibromyalgia. Plaintiff reported regular exercise, and complained only of some tenderness in his lower back. (R. 511, 657–60)

In late July 2019, plaintiff reported increasing pain in his right knee, and underwent right knee replacement in November 2019. (R. 693, 760–71) A bout of cellulitis followed, but was resolved by December 2019. (R. 1848) No followup for the knee problem or cellulitis appears in the records for 2020.

In June 2020, plaintiff was diagnosed with "trigger middle finger of the left hand." (R. 1844)

What emerges is a series of genuine and interrelated complaints, some of them serious enough to require surgery. These were largely resolved in a satisfactory manner. What does not appear is any significant evidence or diagnosis of fibromyalgia in the relevant period.

*4. Harmless error*

Plaintiff fails to articulate how a step two medically determinable diagnosis of fibromyalgia could have changed the result. The bottom-line issue, as the ALJ well recognized, is the extent to which the plaintiff's impairment limits basic work activities or impairs the claimant's capacity to cope with the demands of working. (*See* R.11–19, *passim; see also Salles,* 229 F. App'x at 144.)

In the relevant period, Jorge M. received continual medical attention and monitoring. His functioning was, to be sure, limited, accounting for the ALJ's limited RFC, and his further finding that the claimant could perform his past sedentary work. Throughout the administrative process, the claimant essentially attributed those limitations to the well-documented conditions that were found by the ALJ. There is no reason to think that, by forgoing a step two finding of fibromyalgia, the ALJ missed the actual, well-documented limitations on the claimant's functioning.

In his decision, the ALJ exhaustively analyzed the actual limitations that the claimant's medical condition placed upon his ability to perform work-related functions. That evidence included the claimant's own statements to his medical providers, their monitoring of his post-operative recovery, his ability to engage in fairly vigorous exercise and carry on daily activities, and so forth. The ALJ found very significant limitations, constricted the claimant's RFC accordingly, and found him capable of performing his past sedentary work. Attachment of the additional label of fibromyalgia to those limitations would not change the result.

\* \* \*

To summarize, denial of the fibromyalgia-based claim here was supported by substantial evidence, as it was in *Fox v. Comm'r of Soc. Sec.*:

> The Court finds that the ALJ did not err in his determination that Plaintiff's fibromyalgia is not a medically determinable impairment, let alone a severe impairment, for two reasons: (1) Conclusory statements by a medical provider that a patient suffers from fibromyalgia are insufficient to meet a claimant's burden at

14

step two for establishing a medically determinable impairment, and (2) other impairments, such as Plaintiff's severe impairment of osteoarthritis and sciatica, may also have caused Plaintiff's symptoms.

No. 1:19-CV-04879-NLH, 2020 WL 1888251, at *5 (D.N.J. Apr. 16, 2020). In addition, there was no significant evidence that the effects of fibromyalgia extended into the relevant period or that any error affected the result.

### B. Claimant's subjective testimony regarding pain, reduced attention span, and need for breaks

At the hearing, Jorge M. testified that he needed to elevate his legs; that he had problems with concentration and memory; and that he had pain, for which he had been treated. In a one-paragraph discussion, counsel for the claimant argues that the ALJ failed to address or adequately discuss this evidence, which could have supported further limitations on his RFC, to the point of precluding all available work. (Pl. Brf. 20)

The Social Security Act is clear that "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability[.]" 42 U.S.C. § 423(d)(5)(A); see also 20 C.F.R. § 404.1529(a) (same). In evaluating a claimant's subjective complaints, the ALJ considers evidence from physicians; the claimant's daily activities; and descriptions of symptoms, medication, and other treatment. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *2-4. The ALJ also considers "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. § 404.1529(c)(4). The ALJ is given great discretion in evaluating a claimant's subjective complaints, and such findings are entitled to great deference. *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014).

By no means did the ALJ fail to fulfill his obligation to evaluate complaints of pain in the context of all the medical evidence. He carefully noted the claimant's complaints of neck and back pain, pain when he walks, intermittent radicular symptoms in his right arm, pain throughout his body,

and pain with prolonged sitting or standing. (R. 16–17) Such complaints, the ALJ found, were consistent with the medical evidence, but the evidence did not support "the degree of limitation alleged. The record notes a history of significant surgeries to the claimant's knees, hips, back, and shoulder. Although he continued to report some pain and limitations, the evidence as a whole shows improvement...." (R. 17)

The ALJ noted a remote history of back surgery and complaints of radicular pain. In December 2018, however, the claimant reported an 80% improvement in back pain after physical therapy, and discontinued pain medication. A physical examination showed some reduced range of motion and tenderness, but normal hip function, full strength in lower extremities, normal movement and no tenderness in the neck. Treatment at the time included lumbar epidural steroid injections. (R. 17)

The ALJ noted a November 2018 MRI which revealed moderately advanced multilevel degenerative disc disease, which was treated with physical therapy. An examination in November 2019 revealed no tenderness and normal range of motion in the back. In June 2020, the claimant complained of back pain, but an MRI of the thoracic spine showed small left foraminal herniation but no spinal stenosis or cord compression. "There was no evidence that the claimant required an assistive device, or that he experience limitations that would preclude his ability to sit for majority of the day." (R. 17)[6]

The ALJ noted a history of shoulder surgery in 2009. In December 2018, an examination showed osteoarthritic changes to the right shoulder, resulting in only a decreased range of motion. The ALJ nevertheless considered this impairment in connection with exertional and reaching limitations in the RFC. (R. 17)

---

[6]    Regarding back impairments, *see also* the following reports of office visits to Dr. Brett Gerstman: (R. 513, 516 (Plaintiff reported a "3 month history" of back pain in August 2017, but had "90% improvement in back pain by October 2017 with physical therapy and medication); R. 510-12 (in November 2018 rating pain as a 3 out of 10); R. 507-09 (on December 3, 2018, rating pain as a 2 out of 10 with "80% improvement"; pain medication discontinued)).

Knee impairments, the ALJ noted, had been addressed by surgery. Prior to left knee replacement, the claimant complained of pain, but not motor limits. In December 2017, after the knee replacement, he used an assistive device and underwent physical therapy. By January 2018, he could walk six blocks and no longer used an assistive device. In April 2018, his doctor told him to follow up a year later.

The ALJ noted total right knee replacement in November 2019. Six weeks later, pain and moderate swelling continued, but X-rays showed well-fixed, well-aligned implants. A post-operation bout of cellulitis was resolved with treatment. (R. 18)

The ALJ reviewed a history of degenerative changes prior to the claimant's total right hip replacement in March 2017. Post-surgery, the prosthesis was found to be in good position. The claimant reported stiffness, but no pain. (R. 18; *see also* R. 459-60 (noting that after his knee replacement, claimant reported walking his dog a couple miles a day and cycling for 30 minutes)).

The ALJ noted complaints of joint pain, fatigue, and myalgia at a general examination in September 2018. All joints were normal on inspection.

The ALJ recited that in December 2018, at a consultative orthopedic examination, the claimant complained of cervical spine pain and tingling of the right arm; decreased range of motion and stiffness; radiating pain in the thoracic and lumbar back; numbness in the right foot and left calf; and pain in both knees. On physical examination, the claimant did not need an assistive device. He had various degrees or decreased range of motion in the right shoulder, neck, spine, left hip, and knees, thought he could toe and heel walk. Radiology reports showed ostephytes on both knees and moderate medial joint space narrowing. (R. 18)

The ALJ went on to consider obesity and its aggravating effect, particularly with respect to weight-bearing joints. (R. 18)

The ALJ then review medical opinions as to the functional limitations that would be caused by the above impairments. The four physicians proposed

17

various limitations, but none of them suggested that Plaintiff required an off-task limitation or additional breaks (Tr. 19, 64-65, 89-91, 457, 459, 591).

Significantly the ALJ's findings regarding limitations went beyond those of at least two of the physicians, Drs. Encarnacion and Simpkins. The ALJ specifically cited pain as a justification for doing so:

> The evidence supports greater standing, kneeling, crouching, and crawling limitations considering his hip and knee impairments (Exhibit 1A/8). The claimant would also reasonably be precluded from working at unprotected heights and around hazardous moving mechanical parts due to pain, gait limitations, and knee and hip limitations.
>
> . . .
>
> [C]onsidering the claimant's numerous surgeries, complaints of back pain, and antalgic gait would reasonably be limited in his ability to stand and/or walk for majority of the workday. In that regard, the [consultant] opinion [on reconsideration] is supported by and consistent with the evidence

(R. 19)[7]

There is therefore substantial evidence to support the ALJ's bottom-line determination, which explicitly incorporated the claimant's complaints of pain, viewed in the context of corroborative medical evidence:

> The claimant certainly has a history of significant surgeries, and orthopedic limitations. However, the evidence generally notes improvement post-surgery, with no significant sitting limitations. Nonetheless, the undersigned considered the claimant's subjective complaints, to the extent they are supported by the objective medical evidence in assessing limitations in the residual functional capacity.

(R. 19).

---

[7]   There was no significant medical evidence to corroborate any claim of memory or concentration loss. The claimant did not claim difficulties with memory or concentration in his function report (R. 248). Records during the relevant period are consistent with a finding of no serious memory or attention difficulties (R. 400, 918, 921, 1824-25).]

### C. Lay Witness Statements of Relatives

Jorge M. claims that the ALJ did not properly consider or weigh letters from his daughter and sister regarding his impairments, particularly his difficulty sitting, walking, and standing as a result of pain. (R. 294–95). Each is a one-page letter, dated May 26, 2020. An ALJ's RFC determination must be based on "all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3). But "medical evidence" and "other evidence," such as lay statements, do not require the same treatment.

To reject a medical opinion, the ALJ must point to "contradictory medical evidence." *Cunningham v. Comm'r of Soc. Sec.*, 507 Fed. App'x 111, 118 (3d Cir. 2012). Where the ALJ discounts, rather than rejects, medical opinion evidence, the ALJ must "consider all the evidence and give some reason for discounting the evidence." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). *See generally* 20 C.F.R. § 414.1520c(a)–(c).

As to evidence from nonmedical sources, however, under the rules amended effective March 27, 2017, an ALJ is not required to apply that analytical framework:

> **§ 404.1520c How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017.**
>
> . . .
>
> (d) Evidence from nonmedical sources. We are not required to articulate how we considered evidence from nonmedical sources using the requirements in paragraphs (a) through (c) in this section.

20 C.F.R. § 414.1520c(d). In particular, an ALJ is not required to "weigh" or "assess" such nonmedical evidence, articulating reasons for assigning it specific persuasive value, as in the case of medical evidence. Jorge M. concedes that this revised regulation applies to his claim, which was filed on September 13, 2018, and that the ALJ was not required to "weigh" his family members' statements in the same manner as medical evidence. (Pl. Reply at 5)

19

I agree, however, that it is possible to push the amended regulation's non-articulation principle too far:

> While the Court agrees that the new regulations do not authorize an ALJ to disregard all relevant evidence from third parties all together, under those regulations, the ALJs need not articulate how they considered such evidence with the same type of requirements for medical opinions and prior administrative medical findings.

*Aguiar v. Kijakazi*, No. CV 20-18551 (FLW), 2022 WL 462093, at *9 (D.N.J. Feb. 15, 2022). "While the new rules relieve ALJs from the burden of articulating their consideration of nonmedical source statements using the same standards that apply to medical opinions and prior administrative medical findings, 20 C.F.R. § 416.920c(d), that does not constitute permission to ignore relevant evidence." *Fisher v. Comm'r of Soc. Sec.*, No. 20-1467, 2021 WL 4288313, at *5 (W.D. Pa. Sept. 21, 2021).[8]

The ALJ, then, is not required to articulate an analysis of how he or she weighed nonmedical evidence, but cannot simply ignore relevant evidence, either. Where, as here, the ALJ's decision does not specifically cite such non-medical evidence, the court's review function may be made more difficult.[9]

The question becomes one of whether the ALJ "ignored" such evidence, *i.e.,* failed to consider it at all. Although a specific citation to the evidence would have made the court's job easier, I will not lightly assume that an ALJ, in delivering a thorough opinion based on the points and claims stressed by the claimant, "ignored" other portions of the record. I will, however, review the two cited letters with an eye to whether they would affect the result.

---

[8]   *Kyra H. v. Comm'r, Soc. Sec. Admin.*, No. 6:18-CV-01979-AC, 2020 WL 2216912, (D. Or. May 7, 2020), cited by the SSA, is a pre-March 27, 2017 case, which notes in dictum the intervening changes to the rules. *Id.* at *19 & nn.7, 8. I therefore do not give it a great deal of weight.

[9]   I set aside the easy case of evidence that does not rise to the level of being "relevant."

The claimant's adult daughter writes that her father has always experienced pain. Tasks such as cutting grass, and even walking, cause pain. When he is in pain, he is short tempered and will spend the day in his room. She recalls their childhood vacations, when her father took long walks and swam in the ocean; now, she says, he stays in the hotel, and on trips to the mall, tends to remain in the car. (R. 294)

The claimant's younger sister notes his declining health. Formerly, she says, they had active vacations and family gatherings, which have diminished greatly. Formerly a home handyman, he now does very little. Sitting, standing, and bending are painful. He has discontinued his weekly visits to her. On their recent vacation she noted his struggles with the plane and car rides. She noted that his sleep was interrupted because he would get up and walk around as a result of the pain. His mood and mental focus, too, had deteriorated. (R. 295)

Initially, I note that the regulations as amended do not require the ALJ to cite or discuss such evidence. Even assuming *arguendo* that the ALJ should have analyzed and cited these letters, however, they would not have changed the result. *See generally Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (applying, in VA disability benefits case, the usual rule requiring a showing of prejudice or harmless error to gain reversal).

When these letters do not simply contradict or exaggerate the claimant's own testimony regarding his pain, they are cumulative of that testimony. To be sure, the claimant suffered from legitimate ailments, and underwent corrective surgery. In connection with his application for benefits, he testified to his subjective pain, generally in terms similar to those expressed by his daughter and sister. *See* Section III.B, *supra.*

There is little reason to believe that these letters would have altered the ALJ's careful analysis of plaintiff's own, similar testimony. The ALJ thoroughly considered that testimony in light of the actual, direct medical evidence, which included the claimant's own statements to his physicians for the purpose of treatment. (*See* R. 16-17 (discussing Plaintiff's allegations with respect to pain throughout his body, walking, prolonged sitting, and standing); R. 17

(discussing 80% improvement in back pain after physical therapy); R. 513, 516 (Plaintiff reported a "3 month history" of back pain in August 2017, but had "90% "improvement in back pain by October 2017 with physical therapy and medication); R. 510-12 (rating pain as a 3 out of 10 in November 2018); R. 507-09 (rating pain as a 2 out of 10 with "80% improvement"); R. 18, 459-60 (noting that after his knee replacement, he walked his dog a couple miles a day and cycled for 30 minutes).

At best, then, these letters bolstered plaintiff's own account. If the ALJ had found the plaintiff incredible, such bolstering might have had more significance. But the ALJ did not; he obviously credited Plaintiff's complaints to a considerable degree and, in formulating the RFC, imposed greater restrictions than would have been found based solely on the evidence of treating physicians Dr. Haas, Dr. Encarnacion, and Dr. Simpkins (R. 64-65, 89-91, 457, 459). No medical source suggested greater specific functional limitations.

Given the primacy of medical evidence and the ALJ's careful consideration of the claimant's own statements and complaints, the claimant fails to show how the ALJ's further consideration or discussion of his daughter's and sister's letters would have altered the ALJ's decision.[10]

### D. New evidence regarding trigger finger

In connection with this application for benefits, the claimant reported a "trigger finger" condition in his middle finger, left hand.[11] This was among the

---

[10]    To some degree, by the way, these letters may be harmonized with the ALJ's findings. There is little doubt that, at times, the claimant must have experienced considerable pain. The evidence is clear, however, that these conditions were treated, surgically and otherwise, and that the claimant reported very significant improvement, permitting fairly vigorous physical activity. *See also* 20 C.F.R. § 404.1509 (to be severe, nonfatal impairment "must have lasted or must be expected to last for a continuous period of at least 12 months.").

[11]    **Overview**

Trigger finger is a condition in which one of your fingers gets stuck in a bent position. Your finger may bend or straighten with a snap — like a trigger being pulled and released.

Trigger finger is also known as stenosing tenosynovitis (stuh-NO-sing ten-o-sin-o-VIE-tis). It occurs when inflammation narrows the space within the

list of conditions that the ALJ found to be "non-severe impairments because the evidence does not suggest that they more than minimally interfere with the claimant's ability to perform basic work activities." (R. 14) Reviewing the evidence, the ALJ found that this condition (among others) was "not documented to cause significant functional limitations and [was] treated conservatively." (R. 15) At the hearing, the claimant referred to a "temporary" condition in his left hand, stated that it caused him "a little pain," but denied that it affected "what I do." (R. 51)

Post-hearing, on November 4, 2020, Jorge M. underwent a "release" procedure to correct the trigger finger condition in his left middle finger. Under local anesthetic, the surgeon freed the A1 pulley, leaving the patient able to flex and extend the finger without triggering or locking. In short, the condition was corrected by what appears to be minor elective surgery. While his administrative appeal was pending, Jorge M. submitted additional evidence,

---

sheath that surrounds the tendon in the affected finger. If trigger finger is severe, your finger may become locked in a bent position.

People whose work or hobbies require repetitive gripping actions are at higher risk of developing trigger finger. The condition is also more common in women and in anyone with diabetes. Treatment of trigger finger varies depending on the severity.

**Symptoms**

Signs and symptoms of trigger finger may progress from mild to severe and include:

Finger stiffness, particularly in the morning

A popping or clicking sensation as you move your finger

Tenderness or a bump (nodule) in the palm at the base of the affected finger

Finger catching or locking in a bent position, which suddenly pops straight

Finger locked in a bent position, which you are unable to straighten

Trigger finger can affect any finger, including the thumb. More than one finger may be affected at a time, and both hands might be involved. Triggering is usually more pronounced in the morning, while firmly grasping an object or when straightening your finger.

https://www.mayoclinic.org/diseases-conditions/trigger-finger/symptoms-causes/syc-20365100

consisting of a one-page medical report of the surgery from the Wayne Surgical Center. (R. 32)

Where new evidence is submitted following the claimant's hearing, and it relates to the relevant period, the Appeals Council "shall" consider it, and "shall evaluate the entire record including the new and material evidence." 20 C.F.R. § 404.970. Where the Appeals Council has erred in not considering such evidence, the Court may order a "sentence six" remand.[12]

The Appeals Council ruled that the report did not relate to the relevant period:

> You submitted a medical record from Wayne Surgical Center dated November 4, 2020 (1 page). The Administrative Law Judge decided your case through September 30, 2020. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before September 30, 2020.

(R. 2) The claimant objects that he did report finger pain during the relevant period, and that the condition required surgery shortly after the ALJ's decision. (Pl. Br. 21–22)

The Appeals Council had ample basis to conclude that this report did not relate to the relevant period. The trigger finger condition was reported in connection with the relevant period; the ALJ discussed it and found it to be a non-severe impairment. The additional information that the condition was corrected by elective surgery did not constitute further evidence that this was a severe impairment.

At any rate, there is no evidence that the trigger finger condition met the 12-month durational requirement for a severe impairment. The first complaint of record regarding pain in the left middle finger dates from June 8, 2020 (R.

---

[12] A reviewing court may consider evidence not presented to the ALJ only to determine whether it warrants remand under sentence six of 42 U.S.C. § 405(g). Sentence six requires a plaintiff to prove that the additional evidence is (1) new; and (2) material; and (3) that good cause exists for not presenting the evidence to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 591-93 (3d Cir. 2001).

1842), at which time the claimant reported having had general hand pain for the preceding four months. Assuming, then, that it began in February 2020, the condition would have had to last (or be expected to last) through February 2021, which is not the case.

Further, there is no other evidence that this condition caused any significant functional limitation. The record does not reveal the condition's level of seriousness. At the hearing, the claimant testified that he had a "temporary" issue with his left hand and that while his middle finger sometimes locked up, he did not have trouble with fine motor skills that would affect "what I do." (R. 51).

Remand is not required for consideration of this new evidence.

## IV.    CONCLUSION

For the reasons set forth above, the Commissioner's decision is affirmed. A separate order will issue.

Dated: September 28, 2022

/s/ Kevin McNulty

_____
**Hon. Kevin McNulty**
**United States District Judge**